## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MARY MAYS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:19-CV-01152-ELR |
| | * | |
| INTERNATIONAL FOLLIES, INC., | * | |
| d/b/a CHEETAH et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

**O R D E R**

_____

Presently before the Court is Defendants' Motion for Summary Judgment. [Doc. 64].  The Court's rulings and conclusions are set out below.

## I.    Background

This case involves Plaintiff Mary Mays' claims against Defendants International Follies, Inc. d/b/a Cheetah ("The Cheetah"), and Jack Braglia for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*  Compl. [Doc. 1].  Defendants operate an "upscale entertainment club" located in Atlanta, Georgia, known as The Cheetah.  Defs.' Statement of Material Facts ¶ 1 [Doc. 64-4] ("Defs.' SOMF").  Defendant Braglia is, and was at the time of Plaintiff's employment, the general manager of The Cheetah.  Id. ¶ 12.  Plaintiff

worked at The Cheetah as an entertainer from April 8, 2016, through November 3, 2018, mostly working night shifts.  Id. ¶¶ 2, 11.

According to Defendants' written tip policy, The Cheetah pays its female entertainers the minimum wage of $7.25 per hour by paying a cash wage of $2.13 per hour and applying a tip credit of $5.12 per hour.  Id. ¶¶ 3, 15.  Additionally, pursuant to the terms of the written tip policy, Plaintiff and other dancers would contribute 10% of their total tips to floormen and disc jockeys as part of a tip-pooling arrangement.  Id. ¶¶ 15–16.  Defendants contend this was the only mandatory tip-sharing arrangement required by The Cheetah.  Id. ¶ 17.

However, Plaintiff disputes Defendants' characterization of The Cheetah's tip policy and claims she was required to participate in an unlawful tip pool.  Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 15, 18 [Doc. 66-1] ("Pl.'s Resp. to Defs.' SOMF").  She asserts that in addition to the 10% she gave to floormen and disc jockeys—as mandated by the written policy—she participated in other unwritten mandatory tipping.  Pl.'s Statement of Material Facts ¶¶ 20–28 [Doc. 66-2] ("Pl.'s SOMF").   Plaintiff asserts she was required to give extra portions of her tips to floormen as a "fee" when they "referred" a customer to her for a VIP dance session. Id. ¶ 26.  Plaintiff also contends that she had to share her tips with other staff not included in the written tip policy, such as "housemoms" who received a portion of each dancer's tips at the end of every shift.  Id. ¶ 27.

Moreover, beyond those payments, Plaintiff asserts she was required to pay additional uncompensated fees—"kickbacks"—which caused her wages to drop below minimum wage. [Doc. 66 at 12]. For example, Plaintiff had to pay for her own mandatory adult entertainment work permit (as required by the City of Atlanta), paid a $3 parking fee every time she worked at the club, and alleges she had to pay other dancers approximately $40 to "cover" her shifts when necessary.[1] [Id. at 13–14]; Pl.'s SOMF ¶¶ 2, 5, 29. Plaintiff also maintains that in order to comply with Defendants' strict dress code policy, she typically paid "$60 each shift to have her make-up and hair done" to be ready for work. [Doc. 66 at 14]. Plaintiff asserts that she paid these costs and fees out of her tips and wages, and that these additional fees caused her wages to drop below the minimum wage during the workweeks she had to pay them. [Id.]

Additionally, all dancers were subject to The Cheetah's "waiting policy," which required entertainers to engage in check-out procedures and wait until all customers had departed the premises before the dancers were permitted to leave. Pl.'s SOMF ¶ 15. Plaintiff asserts that she typically waited at least thirty (30) minutes every time her shift ended—time for which she was not compensated. Id. ¶ 17. Accordingly, Plaintiff accuses Defendants of violating the FLSA by failing to

---

[1] The City of Atlanta requires adult entertainers to maintain a city-issued permit from the Atlanta Bureau of Police Services Permit Department, which is why The Cheetah requires its dancers to have a permit. See Samantha Kim Dep. at 40: 9–21 [Doc. 64-15].

pay minimum wage, failing to pay overtime wages, taking "kickbacks" in the form of unlawful deductions, and by requiring Plaintiff to participate in unlawful tip-pooling. [See generally Doc. 66].

Defendants deny any wrongdoing, stressing that Plaintiff's minimum wage and overtime wage claims are not recoverable because she seeks compensation for non-compensable preliminary and postliminary activities. [Doc. 64-1 at 4–12]. In addition, Defendants argue that The Cheetah's tip credit policy is valid and that none of Plaintiff's claims for additional payments are compensable under the FLSA. [Id. at 12–23]. Finally, Defendants assert they are entitled to a good faith defense even if the Court finds there was a FLSA violation. [Id. at 23–24]. Thus, Defendants move for summary judgment on all of Plaintiff's claims.[2] [Id. at 25]. Having been fully briefed, Defendants' motion is now ripe for the Court's review.

---

[2] Additionally, Defendants have filed two (2) objections. [Docs. 68, 69]. In their first objection, Defendants move to strike certain statements Plaintiff makes in her sworn declaration (the "Declaration of Mary Mays") [Doc. 66-3] as part of her "Response in Opposition to Defendants' Motion for Summary Judgment." [Doc. 68]. In their second objection, Defendants move to strike the depositions Plaintiff submits in support of her response [Docs. 66-4 through 66-10], because these depositions were taken in 2017 for prior, unrelated litigation, namely: Valente, et al. v. Int'l Follies, Inc. d/b/a The Cheetah, No. 1:15-CV-02477-ELR ("Valente"). [Doc. 69]. Plaintiff did not respond to Defendants' objections, and thus, the Court treats Defendants' objections as unopposed. See LR 7.1(B), NDGa. ("Failure to file a response shall indicate that there is no opposition[.]"). Accordingly, noting no opposition and for good cause shown, the Court grants Defendants objections. [Docs. 68, 69.]. Thus, in resolving Defendants' motion for summary judgment, the Court does not consider certain paragraphs from Plaintiff's declaration nor the objected-to depositions.

## II.    Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law.  Id.  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  Id. at 249.

When ruling on a motion for summary judgment, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party meets this initial burden, to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  Id. at 324–26.  The essential question is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

## III.   Discussion

In her Complaint, Plaintiff brings three (3) counts against Defendants:  Count I—Minimum Wage Claim (Claims for Violation of 29 U.S.C. § 206); Count II—Overtime Wage Claim (Violation of 29 U.S.C. § 207); Count III—Unlawful Taking of Tips (Violation of 29 U.S.C. § 203).  See Compl.  Defendants argue that the undisputed facts of this case foreclose Plaintiff's claims for four (4) reasons: (1) Plaintiff cannot recover overtime wages for any preliminary and postliminary time, (2) Plaintiff cannot prevail on her claim for alleged violations of the FLSA's tip credit provisions, (3) Plaintiff cannot recover any of the "fees" she paid because they are non-compensable, and (4) even if Defendants violated the FLSA's tip credit provisions, they are entitled to a good faith defense.  [See Docs. 64-1, 70].  Thus, Defendants contend that they are entitled to summary judgment. [Doc. 64-1].  The Court discusses each of these issues in turn.

### A.    Plaintiffs Claim for Overtime Claim

First, the Court turns to Plaintiff's overtime wage claim regarding her pre-shift and post-shift activities.  See Compl.  Plaintiff argues that Defendants failed to pay earned overtime wages for the time she spent preparing for work and waiting after work pursuant to The Cheetah's "waiting policy."  Id. ¶¶ 103–104, 108; Pl.'s SOMF

¶¶ 15–19.  Defendants disagree, contending that Plaintiff cannot be compensated for the time and money she spent "getting ready" for her shifts because pre-shift preparation is preliminary work not covered by the FLSA.[3]  [Doc. 64-1 at 9–12]. Additionally, Defendants claim that they are not required to compensate Plaintiff for any postliminary activities, including the time Plaintiff spent on post-shift check-out procedures and waiting for customers to leave.  [Id. at 16–17].

### 1.   FLSA: Preliminary and Postliminary Activities

The FLSA requires an employer to compensate any employee who works in excess of forty (40) hours per week at an overtime rate (typically, one and one-half times the employee's regular pay rate).  Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1314 (11th Cir. 2007) (citing 29 U.S.C. § 207(a)(1)).  However, pursuant to the Portal-to-Portal Act of 1947, employers are exempt from liability for failure to compensate an employee for:

> (2) activities which are preliminary to or postliminary to [the employee's] principal activity or activities,
>
> which occur either prior to the time of any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

---

[3] Moreover, Defendants claim that "entertainers clock in when they arrive even if they are getting ready for work"—accordingly, Defendants assert that "Plaintiff was [already] compensated for non-compensable preliminary time spent getting ready for work (including hair and makeup)." [Doc. 64-1 at 9].

29 U.S.C. § 254(a).  Here, the term "principal activity or activities" includes "all activities that are an 'integral and indispensable part of the principal activities.'" Llorca v. Sheriff, Collier Cty., 893 F.3d 1319, 1323 (11th Cir. 2018) (quoting Steiner v. Mitchell, 350 U.S. 247, 256 (1956)).  Thus, "preliminary and postliminary activities are compensable only if they are *both* an integral *and* indispensable part of the principal activities." Id. at 1324 (emphasis in original) (internal citations omitted).

To determine which activities are integral and indispensable, the Eleventh Circuit has explained that "indispensable is not synonymous with integral." Id. at 1323 (internal marks and citation omitted).  "The fact that certain preshift [and postshift] activities are *necessary* for employees to engage in their principal activities does not mean that those [] activities are '*integral and indispensable*' to a principal activity . . . ." Bonilla v. Baker Concrete Constr., Inc., 487 F.3d 1340, 1344 (11th Cir. 2007) (emphasis added) (internal marks and citation omitted).  Therefore, "[a]n activity is integral and indispensable to an employee's principal activities if the activity is an intrinsic element of those activities and one with which the employee cannot dispense if [s]he is to perform the activities." Meeks v. Pasco Cty., 688 F. App'x 714, 717 (11th Cir. 2017) (internal marks and citation omitted).

2.    *Analysis*

Having laid out the legal framework, the Court turns to its analysis on this claim.  As an initial matter, Plaintiff states in her Complaint that, in order to meet The Cheetah's "strict dress and appearance requirements," she typically spent "an excess of an hour per shift of time to get ready for work."  Compl. ¶ 103.  Thus, she claims she was entitled to compensation for that time.  Id. ¶¶ 104–105, 144. However, in their motion, Defendants present evidence that Plaintiff did receive compensation for "getting ready" for her shift because she was already clocked in at the club during this time.  [Doc. 64-1 at 9].  In her response, Plaintiff fails to present any contrary evidence or make any other arguments as to why she was entitled to payment for her pre-shift activities.  [Doc. 66 at 4–9].  Plaintiff's failure to respond or provide contrary evidence constitutes abandonment of her overtime claim as it relates to her pre-shift activities.  See Grant v. Miami-Dade Cty., No. 13-22008-CIV, 2014 WL 7928394, at *9 (S.D. Fla. Dec. 11, 2014), aff'd sub nom., 636 F. App'x 462 (11th Cir. 2015) ("Where a [party] fails to respond to an argument in a motion for summary judgment, [s]he waives the argument.  Summary judgment [on that issue] is appropriate.").  Thus, the Court finds that Defendants are entitled to summary judgment on this point.  Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary

judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.").

Consequently, Plaintiff's only remaining overtime claim is for her post-shift activities. Pursuant to The Cheetah's "waiting policy," Defendants required Plaintiff to wait until all customers completely dispersed from the parking lot before allowing Plaintiff to depart the premises. [Doc. 66 at 6]. Plaintiff seeks compensation for that time. [Id.]

Upon review, the Court finds that as a matter of law, Plaintiff is not entitled to receive compensation for her post-shift activities. In making this determination, the Court finds the Supreme Court's decision in Integrity Staffing Sols., Inc. v. Busk to be instructive. 574 U.S. 27, 33 (2014). In Integrity Staffing, an employer required its warehouse employees to undergo anti-theft security screenings before leaving work each day. Id. at 30. The warehouse employees sued the employer, arguing that the time they spent awaiting and undergoing 66 at 6] these security screenings was compensable overtime according to the FLSA. Id.

The Supreme Court disagreed. Id. First, the Court reaffirmed the principle that compensable activities (as contemplated by the FLSA) include those "activities which are an integral and indispensable part of the principal activities." Id. at 33 (internal marks and citations omitted). As the Court explained, "an activity is integral and indispensable to the principal activities that an employee is employed

to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id. at 37.  Using this framework, the Court determined the mandatory security screenings were not integral and indispensable to the principal work the warehouse employees were required to perform because their "principal work" was retrieving products from warehouse shelves and packaging those products for shipment. Id. at 35.  The Court held that the employer "could have eliminated the screenings altogether without impairing the employee's ability to complete their work." Id.  Therefore, the time the employees spent during the security screenings was not compensable. Id.

In light of this precedent, the Court finds that completing check-out procedures and waiting for customers to vacate the premises were not integral and indispensable to the principal activity Plaintiff was employed to perform.  Plaintiff was hired to dance and entertain customers; these post-shift requirements were not "intrinsic element[s]" of those principal activities. See Integrity Staffing, 574 U.S. at 39 (Sotomayor, J., concurring) (explaining that 29 U.S.C. § 254(a) "distinguishes between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence performed for an employer,' on the other hand").  Because these activities could have been eliminated without impairing Plaintiff's ability to complete her work, they were not

11

integral and indispensable to Plaintiff's employment.  Id. at 35.  Thus, the time associated with these activities is non-compensable pursuant to the FLSA.

Nevertheless, Plaintiff argues she should be compensated because Defendants *required* her to wait for an undetermined period after every night shift.  [Doc. 66 at 9].  But the Court finds Plaintiff's reliance on her employer's requirements to be misguided.  As explained above, the focus of the integral and indispensable test is on "the productive work that the employee is *employed to perform*," not "on whether an employer *required* a particular activity."  Integrity Staffing, 574 U.S. at 36 (emphasis in original) (internal citations omitted).   As such, Plaintiff's claim regarding overtime wages for post-shift activities fails, and Defendants are entitled to summary judgment on this issue.

### B.    Plaintiff's Tip Credit Claim

Next, the Court turns to Plaintiff's claim regarding FLSA's tip credit policy. Plaintiff claims that Defendants required her to participate in forced tip-outs and forced covers, which caused her wages to fall below minimum wage.  [Doc. 66 at 10–12].  Further, Plaintiff alleges that two (2) tip policies—a written tip policy and an unwritten but equally mandatory tip policy—were both unlawfully enforced at The Cheetah in violation of the FLSA.  [Id.]  In their motion for summary judgment, Defendants argue the contrary—that The Cheetah's tip credit policy is valid and no unlawful tipping occurred.  [Doc. 64-1 at 12–21].  The Court first sets out the legal

framework regarding FLSA tip credits before turning to an assessment of the Parties' arguments.

       *1.    FLSA: Tip Credit Provision*

As noted above, the FLSA requires employers to pay employees a minimum wage of $7.25 per hour.  29 U.S.C. § 206(a)(1).  Recognizing that many employees earn income through tips, the "tip credit" provision of the FLSA allows employers to incorporate employees' tips into their wage calculation to satisfy the minimum wage requirement, provided that certain conditions are met.  29 U.S.C. § 203(m)(2)(A).  The statute sets forth two (2) requirements for employers who avail themselves of the tip credit policy:

> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The [tip credit] shall not apply with respect to any tipped employee unless [1] such employee has been informed by the employer of the provisions of this subsection, and [2] all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Id.  In other words, for a tip credit policy to be valid: (1) the employer must give employees notice of the tip credit policy, and (2) employees must retain all tips received—except where the employer requires the employees to participate in tip-pooling to redistribute a portion of their tips to other employees who "customarily and regularly receive tips."  Id.

Prior to March 23, 2018, only employers were prohibited from participating in a tip pool. Cf. Kubiak v. S.W. Cowboy, Inc., 164 F. Supp. 3d 1344, 1361–62 (M.D. Fla. 2016) ("[S]ection 203(m) effectively prohibits any arrangement or agreement between an employer and employee whereby any portion of the employee's tips becomes the property of the employer."). However, after March 23, 2018, 29 U.S.C. § 203(m) was modified to prohibit managers and supervisors from participating in a tip pool. See 29 U.S.C. § 203(m)(B) ("An employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips regardless of whether or not the employer takes a tip credit.") (effective March 23, 2018); see also Miller v. Garibaldi's Inc., No. CV414-007, 2018 WL 1567856, at *4 (S.D. Ga. Mar. 30, 2018).

2.    *Analysis*

The Court now turns to an assessment of the Parties' arguments. As mentioned above, for a tip credit policy to be valid: (1) the employer must give employees notice of the tip credit policy, and (2) employees must retain all tips received—except where the employer requires the employees to participate in tip pooling to redistribute a portion of their tips to other employees who "customarily and regularly receive tips." See 29 U.S.C. § 203(m)(2)(A). Here, Plaintiff argues that Defendants violate the second condition of 29 U.S.C. § 203(m)(2)(A), because

Plaintiff was forced to participate in a tip pool with management, supervisors, and employees who did not "customarily or regularly receive tips." [Doc. 66 at 10–12].

The Cheetah's written tip policy for dancers stated:

> You are required to contribute 10% of your total tips to floor managers and disc jockeys (collectively) as part of a tip-pooling arrangement. No other mandatory tipping is required. With the exception of any lawful contributions to a tip pool that you may be required to make, the applicable law requires that you be allowed to retain all of your remaining tips. Management will not retain any of your tips.

[See Doc. 64-10]. Although the tip policy stated that "management will not retain any of your tips," Plaintiff contends she was forced to share her tips with Robert ("Bob") Johnson, a floorman who also served as a night manager, as well as Samantha Kim, a day shift manager. Thus, Plaintiff argues The Cheetah's tip pool was invalid. [Doc. 66 at 11]. In addition, Plaintiff contends that the participation of the floormen, disc jockeys, and "housemoms" in the tip pool was unlawful because they were not "regularly tipped" employees. [Id. at 12]. Thus, Plaintiff claims she is entitled to damages.

The Court will first address the validity of The Cheetah's tip credit policy in light of how the tip pool operated with regards to Bob Johnson and Samantha Kim. Next, the Court will assess whether floormen, disc jockeys, and "housemoms" were "regularly tipped" employees.

a.    <u>Bob Johnson</u>

The Court begins by addressing the Parties' arguments regarding Bob Johnson's participation in the tip pool.  In their motion, Defendants divide their arguments regarding Bob Johnson into two parts: (1) Johnson's participation in the tip pool pre-March 23, 2018, and (2) Johnson's participation in the tip pool post-March 23, 2018.

Defendant argues that prior to March 23, 2018, only employers were prohibited from participating in a tip pool, and Johnson was not an employer pursuant to FLSA.  [Doc. 64-1 at 18–20].  Because Johnson was not an employer as defined by the FLSA, Defendants argue that Johnson's participation in the tip pool was valid until March 23, 2018.  [<u>Id.</u>]  In her response, Plaintiff offers no arguments or evidence to rebut Defendants' arguments and evidence that Bob Johnson was not an employer as defined by the FLSA.  [<u>See</u> Doc. 66 at 11].  Thus, the Court finds that Johnson's participation in the tip pool, up until March 23, 2018, was valid.  Therefore, Defendants are entitled to summary judgment on this point.  <u>See</u> <u>Burnette</u>, 342 F. Supp. 2d at 1140.

As for Johnson's participation in the tip pool post-March 23, 2018, Defendants argue that although Johnson was called a "night manager," he did not qualify as a manager or supervisor according to the FLSA definitions.  Specifically, Defendants argue that an employee is only a manager or supervisor for the purposes

of 29 U.S.C. § 203(m) where he is "[c]ompensated on a salary basis pursuant to [a set rate]." [64-1 at 21] (citing 29 C.F.R. § 541.100(a)).  Defendants present evidence that until June or July 2018, Johnson was paid an hourly wage and was not a salaried employee.  Bob Johnson Dep. at 8:8–18, 9:10–25 [Doc. 64-14].  Once Johnson began receiving a salary, he stopped participating in the tip pool.  Id. at 9:10–25.  Additionally, Defendants proffer evidence that Johnson did not have any managerial duties until he became a salaried employee.  Id. at 22:7–19.

Plaintiff disagrees and argues that Johnson served as a manager and supervisor.  [Doc. 66 at 10–11].  However, Plaintiff provides no valid evidence on the record to dispute Defendants' evidence.[4]  Because Plaintiff fails to rebut Defendants' evidence, no genuine issue of material fact exists, and the Court finds that Defendants are entitled to summary judgment on this point.  See FED. R. CIV. P. 56(c).

### b.    Samantha Kim

Next, the Court turns to the Parties' arguments regarding Samantha Kim, a day shift manager and "housemom" at The Cheetah.  See Pl.'s SOMF ¶ 52.

---

[4] As noted above, the Court disregards portions of Plaintiff's declaration and the depositions she submitted to support her response because she failed to respond to Defendants' objections.  See supra n.2.  Plaintiff proffers deposition testimony from a 2015 case brought against The Cheetah, Valente, which concerned employment practices at The Cheetah during a timeframe earlier than that implicated by the matter at hand. Id.  Thus, even if the Court were to consider the deposition testimony Plaintiff propounds, Plaintiff has failed to explain why such evidence is relevant to this case.  [See generally Doc. 66].

Defendants argue that they are entitled to summary judgment on this point because, as a "housemom," Samantha Kim was not included in the mandatory tip pool. [Doc. 70 at 6]. They provide further evidence that any tips Kim received were voluntarily shared. [Id.]; see also Kubiak, 164 F. Supp. 3d at 1355 (stating that "a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee so long as that tip-sharing is done without coercion by the employer"). Plaintiff again fails to provide any relevant evidence on the record to dispute Defendants' argument. [See Doc. 66]. In the absence of evidence to the contrary, the Court finds that Defendants are entitled to summary judgment on this point.

c.   Floormen, Disc Jockeys, and "Housemoms"

Finally, the Court turns to the Parties' arguments regarding the participation of "all other" floormen, disc jockeys, and "housemoms" in the mandatory tip pool. Pursuant to the FLSA, a tip pool can only be shared among employees who customarily and regularly receive tips. 29 U.S.C. § 203(m). According to 29 C.F.R. § 531.50, the receipt of $30 or more in tips a month establishes that an employee customarily and regularly receives tips. 29 C.F.R. § 531.50.

Here, Plaintiff argues that Defendants fail to demonstrate that "all of the floormen, housemoms and disc jockeys with whom Mays shared her tips customarily and regularly receive at least $30 per month in tips." [Doc. 66 at 11–12]. However,

18

as before, Plaintiff fails to cite to valid evidence to support her claim.  [See id. at 12].

On the other hand, Defendants provide valid evidence and testimony that floormen and disc jockeys were regularly tipped employees.  [See Doc. 64-1 at 14–17].  Additionally, the evidence on the record demonstrates that "housemoms" were not included in The Cheetah's mandatory tip policy, and even vocally upset they were excluded from the policy.  Mary Mays Dep. at 52:22–55:15 [Doc. 64-12].  Because Plaintiff fails to provide valid contrary evidence, the Court finds that Defendants are entitled to summary judgment on this point.

In sum, the Court finds that Defendants are entitled to summary judgment on the entirety of Plaintiff's tip credit claim.

**C.    Plaintiff's "Kickback" Claim**

The Court now turns to Plaintiff's "kickback" claim.  Pursuant to the FLSA, employers must pay employees their wages "finally and unconditionally," "free and clear" of any direct or indirect "kickbacks."  29 C.F.R. § 531.35;[5] see also Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1241 (11th Cir. 2002) ("The FLSA

---

[5] 29 C.F.R. § 531.35 states, in relevant part, that "'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'"  Additionally, "[t]he wage requirements of the [FLSA] will not be met where the employee 'kicks back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee."  Id.

prevents improper deductions from reducing the wages of a worker below the minimum wage.").

Here, Plaintiff claims the various expenses she incurred in furtherance of her employment constituted fees that were "either kicked back to the employer [] or for the employer[']s benefit." [Doc. 66 at 12] (citing De Leon-Granados v. Eller & Sons Trees, Inc., 581 F. Supp. 2d 1295, 1315 (N.D. Ga. 2008) (explaining that "requiring employees to pay for expenses incurred for the benefit of the employer functions as a *de facto* wage deduction")).  According to Plaintiff, these fees included:

- "a 'cover' of at least $40 per shift;"

- "an annual permit of at least $250;"

- "parking fees of at least $3 per shift;"

- "hair and make-up fees of at least $60 per shift;"

- "a 10% VIP referral fee on almost a nightly basis;" and

- "a housemom tip-out of at least $10 per shift."

[Id. at 13].  Plaintiff asserts each time she incurred one of these fees, it caused her wages to impermissibly drop below the legal minimum wage.

However, the Court disagrees. As an initial matter, the Court finds that Plaintiff's claims for compensation regarding payments to makeup artists, hair stylists, and "housemoms" are impermissible because Plaintiff did not include these allegations in her Complaint, instead raising these allegations for the first time in her

response to Defendants' motion for summary judgment.  <u>See</u> <u>Hurlbert v. St. Mary's</u> <u>Health Care Sys., Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006) (requiring the plaintiff to amend the complaint before raising a claim at summary judgment); <u>Gilmour v.</u> <u>Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  Accordingly, the Court will not consider these claims.

As for Plaintiff's claims regarding the other alleged "kickbacks" (specifically, her payments for parking, VIP referrals, "cover" fees, and the City of Atlanta adult entertainment permit), the Court finds that summary judgment in favor of Defendants is appropriate for two (2) reasons.  First, in her response, Plaintiff fails to specifically articulate how these payments were "expenses incurred for the benefit of the employer."[6]  [Doc. 66 at 11–12].  Second, Defendants provide evidence that The Cheetah did not require entertainers to pay cover fees to one another and expressly told entertainers that no other mandatory tipping—besides the 10% for the tip pool—was required.[7]  [Doc. 70 at 13].  Plaintiff provides no valid evidence to the

---

[6] As Plaintiff concedes, the parking deck she used was managed by a valet company that is "totally separate" from Defendants and sets the amount for parking fees.  [Doc. 66-1 ¶ 88].  Additionally, Plaintiff does not cite to any employer policy requiring entertainers to use the parking deck.  [Doc. 66 at 11–12].  Finally, the Plaintiff does not provide any authority to support her claim that Defendants should bear the cost of adult entertainer permits for its dancers, and the Court locates no such requirement.  [<u>Id.</u>]

[7] Additionally, Plaintiff offers no explanation or evidence to support her calculation that she was required to pay $40 in cover fees.  [Doc. 66 at 12–13].

contrary.  Thus, the Court finds that Defendants are entitled to summary judgment on Plaintiff's "kickback" claim.

In sum, Defendants are entitled to summary judgment on all Plaintiff's claims. Therefore, the Court grants Defendants' Motion for Summary Judgment.  [Doc. 64].

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 64] and **DIRECTS** the Clerk to **ENTER JUDGMENT** in favor of Defendants.  The Court further **DIRECTS** the Clerk to **CLOSE** this case.

**SO ORDERED**, this 25th day of September, 2020.

Eleanor L. Ross
United States District Judge
Northern District of Georgia